**KIKER et al. v. UNITED STATES.**

No. 682.

Circuit Court of Appeals, Tenth Circuit.

March 18, 1933.

J. A. Patterson, of Wewoka, Okl. (B. F. Davis, of Wewoka, Okl., on the brief), for appellants.

W. F. Rampendahl, U. S. Atty., of Muskogee, Okl. (Philas S. Jones, Asst. U. S. Atty., of Muskogee, Okl., on the brief), for the United States.

Before LEWIS, COTTERAL, and PHILLIPS, Circuit Judges.

LEWIS, Circuit Judge.

The decree appealed from cancelled a deed of Amey Thlocco, a full blood Seminole Indian, by which on January 28, 1929, she conveyed to Maud Jones, a quarter blood Seminole, an undivided half interest in sixty acres of oil producing land in Seminole County, Oklahoma, which had been allotted to her father. Maud Jones in making the purchase acted as agent of her brother-in-law, V. L. Kiker, who paid the consideration of $15,000 to Amey Thlocco. The decree also cancelled the deed of Maud Jones to Kiker, which conveyed the undivided half to him. Amey Thlocco acquired her title to an undivided five-sixths interest in the sixty acres by devise from her father, a full blood Seminole Indian. He executed his will in November, 1928, and died January 11, 1929, at Amey's home when he was a citizen and resident of Seminole County, age eighty-five years. His will was admitted to probate on February 9, 1929. Amey took as devisee, not as heir. United States v. Fooshce (C. C. A.) 225 F. 521.

Pursuant to the requirements of the Act of April 12, 1926 (44 Stat. vol. 2, p. 239), which amended section nine of the Act of May 27, 1908, the County Court of Seminole County on January 29, 1929, approved the deed given by Amey Thlocco to Maud Jones. That section in part is this:

"The death of any allottee of the Five Civilized Tribes shall operate to remove all restrictions upon the alienation of said allottee's land: Provided, That hereafter no conveyance by any full-blood Indian of the Five Civilized Tribes of any interest in lands restricted by section 1 of this Act acquired by inheritance or devise from an allottee of such lands shall be valid unless approved by the County Court having jurisdiction of the settlement of the estate of the deceased allottee or testator. * * *"

The bill charges that Amey Thlocco and her husband who joined her in executing the deed were uneducated, untutored full blood Indians, had no knowledge whatever of business or value of the sixty acres, that they could not speak or understand the English language, that Amey was easily overcome by statements and representations of Maud Jones, that she was mentally incompetent to take care of her own interests in the transaction, that she and her husband did not understand the import of it, nor the value of the property being conveyed, that its value was well known to Maud Jones and Kiker, who were both present when the deed was made, but they intentionally concealed the facts in that respect from Amey and her husband with the intention and purpose of defrauding her of her property, and that the consideration paid by Kiker was grossly inadequate.

Soon after Amey received the $15,000 from Kiker she began spending her money improvidently, loaned some of it, whereupon a friend and neighbor made complaint to the County Court, and on petition the court held an inquiry within a month after the execution of the deed in question, and thereon found that Amey was mentally incompetent and incapable of managing her affairs, and by order appointed a guardian of her person and estate.

Tewee, Amey's father, had given a Departmental lease on the sixty acres. Six wells were drilled in the summer and fall of 1928. All of them produced oil. The royalties reserved on production under the lease amounted to $85,224.68 from August 1st, 1928, to January 1st, 1929. Witnesses who had dealt in and were familiar with the value of developed oil properties placed valuations on the sixty acres as of the date of the deed given by Amey Thlocco for the whole tract at from $75,000 to $165,000. These, of course, were to some extent estimates dependent upon the value of the oil at times of production and opinion as to length of time production in paying quantities would continue. One of said witnesses stated that the wells would probably settle down and produce for ten years, and there was no proof to the contrary.

There was no direct testimony, aside from the order appointing a guardian for Amey, as to her intelligence and competency to take care of her own interests; but any presumption that might be indulged from that fact seems to be eliminated by an amendment to the bill wherein the plaintiff alleges: "That said order (appointing the guardian) was made without authority of law, and that a guardian for the said Amey Thlocco was unnecessary, and that there was no good reason for the appointment of said guardian for Amey Thlocco." Then again, after stating the name of her guardian and that he had given bond as such, it is further alleged:

"Whereupon the said alleged guardian attempted to qualify, and did take charge of and did receive a large amount of money belonging to the said Amey Thlocco, and other property, and ever since has been and now is in possession of said property of the said Amey Thlocco, contrary to law and against the will or consent of the said Amey Thlocco; that a guardian of the said Amey Thlocco is not necessary."

The District Judge in his findings of fact, said:

"I find that Amey Thlocco was incompetent, and incapable of understanding and appreciating the effect of the transaction, and that the defendants so knew at the time, and that the defendant, Kiker, received the deed for a grossly inadequate consideration; that the value of the sixty acres of land at that time was at least $105,000.00, and that he and Mrs. Maud D. Jones knew of its great value and were seeking to secure it at a greatly inadequate price, and that Mrs. Maud D. Jones was employed by the said Kiker, her brother-in-law, for such purpose * * *."

He further found there had been an "over-reaching of an ignorant, untutored and incompetent Indian."

The defendants Kiker and Maud Jones filed a joint answer in which they denied the incompetency of Amey Thlocco, alleged that she fully understood the transaction, denied that any false statements or representations were made to her, denied the concealment of any facts from her or her husband, denied any intention or purpose to defraud her of her property, and alleged that a full hearing was had in the County Court on petition to approve the deed as to its contents, purport, the consideration to be paid, the knowledge of Amey Thlocco thereof and her affirmative wish and request that it be approved, that after said hearing the County Judge entered an order approving the same, and that no fraud was practised at said hearing. At that hearing testimony was given by Amey, her husband, her half-brothers, Jacob and Whitlock Thlocco, and Allen G. Nichols, an attorney, the only witness as to value. The testimony of Amey at that time as well as later at the trial of this case convinces that she thoroughly understood the transaction and knew the purport of the deed and the effect it would have on her interest. She also knew where the sixty acres was located and that there were six oil producing wells on it. She knew that she was selling thirty acres of the sixty for $15,000, and with it one-half of all royalties on oil thereafter produced. Her husband, her two half-brothers, her daughter and her son-in-law were with her the day before the deed was approved, and they saw her sign the deed. The evidence is convincing beyond question that the deed was read over to her and explained to her in the Seminole tongue by the notary public who took her acknowledgment and that of her husband. Her husband as well as she herself and the other members of her family who were with her at that time fully understood the transaction.

Her testimony as to what happened on that occasion and what was said by the different parties is closely in accord with the testimony of Maud Jones. She and Maud Jones were friends. The whole transaction was had and completed at the home of Maud Jones in the Town of Wewoka. Amey lived about ten miles in the country. She came to town with members of her family for the purpose of selling all or a part of the sixty acres to Maud Jones, having heard that Maud Jones had made two trips to her home with a view of buying the sixty acres. There is no proof whatever of fraudulent or untruthful representations to Amey by Maud Jones or any other person on that occasion, and there is no evidence that Maud Jones who conducted the negotiations knew anything about the value of the sixty acres, but there is evidence that Kiker knew something about its value, and Maud Jones was his agent. He testified that he would have dealt directly with Amey if he could have spoken her language. She did not speak English. He further testified in this case that the County Judge knew that Maud Jones had made the purchase for him, and that he produced to the court a statement of the approximate production of the property, that he owned property in the same field in which the sixty acres was located, and that he estimated its value at $1,000 per acre, that he believed that it would produce $1,000 per acre, but he sought to obtain the benefit of every hazard in making the purchase, that the wells on this property were then flowing on air pressure—that they didn't have enough rock pressure to bring out their own production, and that he had been engaged in the oil business since 1915. His valuation of what he purchased was $30,000.

■■ It is also apparent from a history of the six producing wells that they had greatly decreased in production within six months after they were drilled. They had all been "shot." We have already observed that the royalties that accrued to Tewee during the five months beginning August 1st, 1928, amounted to more than $85,000, although only two wells were completed prior to September and two of the remaining four not until in October. It also appears from the uncontradicted testimony that during the six months immediately following the approval of Amey's deed to Maud Jones the royalties on oil and casing head gas produced amounted to $46,181.33, half of which, $23,090.66, then belonged to Kiker, that is to say, during the six months immediately

following the purchase the entire purchase price was returned to Kiker plus several thousand more, and he still had his half interest in the sixty acres. We cannot avoid the conclusion that the reasonable value of a half interest in the sixty acres was grossly in excess of the purchase price paid, and that Kiker must have so known at the time. Gross inadequacy of price, standing alone, where the parties deal at arm's length and each has a full understanding of the transaction, is hardly sufficient to sustain cancellation. As already said, the proof in our judgment will not support active fraudulent conduct on the part of the purchaser or his agent, but we cannot avoid the conclusion that Amey Thlocco, true to the common disposition of her race, is grossly careless of her interests and improvident in affairs of a business nature, and Kiker must have known that he was taking advantage of that weakness. He lives among them. It was exhibited by Amey Thlocco as soon as the $15,000 came into her hands. The royalties during Tewee's life were paid to the Superintendent of the Five Civilized Tribes, and that was continued after his death. She was willing to make the sacrifice, whatever it might be when measured in a way that had no appeal to her, for the primitive thrill of buying whatever she wanted and spending without restraint for awhile. She already had an automobile, but as soon as she got the $15,000 under her control she bought two or three more, furnished her half-brother with money to buy one, and loaned some of it to a friend or friends. Kiker must have known of this weakness, and he took advantage of it. That is a species of fraud to the keen sense of a Chancellor who administers the functions of a court of conscience.

■ The original bill, the amended bill, several amendments, and a supplement thereto were loosely drawn. They abound in repetitions, conclusions and epithets. Several persons were improperly joined as defendants who had dealt with Amey Thlocco in other transactions and who had no part in the transaction under consideration, all with the approval of the trial judge; but out of it all may be gleaned charges that the transaction with Maud Jones was fraudulent, which charges were specifically denied by the joint answer of Kiker and Maud Jones. The amended bill challenged the approval of the deed to Maud Jones by the County Judge on the ground that sufficient time was not taken in its consideration, that sufficient evidence of the actual, fair market value of the

sixty acres was not heard by him, and that Amey was not properly protected in that procedure, that the consideration was not sufficient, that she was not represented by counsel at the hearing, and that the $15,000 paid by Kiker was grossly inadequate. The County Judge in his approval order found "from the testimony introduced in open court that the consideration above stated ($15,000) is fair and equitable, and is not disproportionate to the value thereof." We do not understand that he acted judicially, but in an administrative capacity. He accepted and discharged the functions of an agent selected by Congress for that purpose. His powers were of the same kind as would have been those of the Secretary of the Interior or anyone else had Congress seen fit to select them instead of him. In Lykins v. McGrath, 184 U. S. 169, 22 S. Ct. 450, 451, 46 L. Ed. 485, the court said of a like authority bestowed upon the Secretary, which required his approval of a deed made by an Indian, that the restriction placed upon the Indian's deed was "in order that he should not be wronged in any sale he might desire to make; that the consideration should be ample; that he should in fact receive it, and that the conveyance should be subject to no unreasonable conditions or qualifications." And so it was held, that his duties having been fully discharged, the deed was not voidable. The functions of the County Judge in this respect are of no greater dignity and force than the act of land office officials in the decisions of contests between claimants to parts of the public domain, and where their decisions have been induced by fraud or mistake they are voidable. Some of the many authorities on the subject may be found in Miller v. United States (C. C. A.) 57 F. (2d) 987, at page 991.

■ The entire proceeding before the County Judge has been brought here in this record. Mr. Kiker was present and had his attorney with him. No other attorney was present. Amey Thlocco was not represented by anyone. Mr. Kiker's attorney examined Amey, her husband, and her two half-brothers. None of them testified as to the value of the sixty acres. No question was asked them on that subject, and it is fairly to be presumed they had no knowledge of its worth. When they had each testified and left the witness stand, the County Judge swore Mr. Kiker's attorney, and he was then examined by Mr. Kiker on that subject. He testified that he had a general knowledge of the value of oil lands in Seminole County. He was then asked whether there was pending litigation over Tewee's estate, which he answered in the affirmative. He was then asked for his opinion as to whether or not $15,000 was disproportionate to the value of a half interest in the sixty acres taking into consideration the pending litigations. He answered:

"I would say, with the impending litigation around the property, the recent cut in the price of oil, I would say that $15,000.00 for a half interest in it is indeed a fair price, considering prospective litigation."

The County Judge then asked:

"Mr. Nichols, when you speak of prospective litigation that might arise, do you have reference to heirship or the will? A. I have reference to both.

"Q. The fact that she would get thirty acres from it regardless how the will is finally settled, would that make any difference so far as the will is concerned, regardless of whether the will is probated or not? A. No, sir.

"Q. What I take it you have in mind is that some heir might show up? A. Yes, sir."

Tewee devised five-sixths of all of his property to his daughter Amey and one-sixth to J. E. Myers, whom he named as "my good friend." The will also contained this clause: "I give and devise to any other children I might have, or other heirs at law, the sum of $5.00." The proof was uncontradicted that Amey was Tewee's only heir had he died intestate. She filed a contest against the will, but withdrew it on obtaining an agreement from Myers waiving any right on his part to royalties that had been paid on oil theretofore produced. Evidence had been taken on the probate of the will prior to the approval of the deed to Maud Jones on January 29th, but the order admitting it to probate as the last will of Tewee was not entered until February 9th. At the hearing in probate Myers testified that Tewee talked to him about litigation affecting his estate, and said when an Indian died he was found to have children he never knew about; that he had had two children but only one child was living. Proof that the other child died in infancy was undisputed. The facts that have just been stated left no ground for discounting the value of Amey's interest in an undivided five-sixths of the sixty acres on the claim that there was pending litigation.

Two days after the deed to Maud Jones was approved by the County Judge, Amey

961

asked him to approve a deed she had just made to one Ryan for the remaining one-third interest in the sixty acres for a consideration of $15,000 to be paid her by Ryan. The County Judge declined to approve it on the ground that the consideration was not enough. Thereupon Ryan raised the amount to $25,000. The County Judge then approved the sale.

Mr. Kiker actively participated in the proceedings which induced the County Judge to approve the deed to Maud Jones. But he concealed the fact that in his opinion what he purchased was worth $30,000, or more. His counsel, under his adroit examination, was the only witness who testified to value when more definite, certain and reliable evidence on that subject was doubtless near at hand. The fraudulent conduct of Kiker, stated supra, in obtaining the deed to Maud Jones seems to have been carried into the proceedings to obtain the approval of the County Judge, and that the latter was led into a mistake of fact and law and was imposed upon by Kiker seems to have been established by the action of the County Judge in reference to the Ryan transaction two days later.

The plaintiff suing in the capacity of Amey's guardian tendered back to Kiker when the suit was brought the $15,000 that he paid to her and deposited it in court for him. On that tender and under the undisputed facts in the case the decree cancelling the two deeds was just.

It is affirmed.